UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Richard Wentzel and<br>Debra D. Wentzel,<br>Plaintiffs,<br><br>vs.<br><br>CitiMortgage, Inc.,<br>a corporation<br>Defendants. | Civil Action No: 11-CV-01236 (MJD/LIB)<br><br>**PLAINTIFFS' RESPONSE IN OPPOSITION TO MOTION TO DISMISS** |

## INTRODUCTION

Plaintiffs stand ready, willing, and able to make payments to the proper holder of their mortgage. They wish to stay in their home and continue to make payments on their mortgage. Defendant, who agreed to revised payment terms and then unconditionally accepted nine payments on the mortgage, suddenly stopped accepting payments and then gave a foreclosure notice. To Plaintiffs' knowledge, Defendant has delayed foreclosure proceedings until actual proof of a mortgage assignment is in Defendant's possession.

Without proof of a mortgage assignment, Defendant is retaining Plaintiffs' mortgage payments unjustly. Defendant must be required to show it has a claim of right to these payments by producing a mortgage assignment document, or admitting that it has no right to the payments, and returning them to the Plaintiffs.

If defendant does own plaintiffs' mortgage and note, then it should be bound to the modified terms it agreed to under the doctrine of promissory estoppels.

## FACTS

Plaintiffs were led to believe, starting in May, 2006, that their loan was being transferred from Harmonic Mortgage to Defendant. (Compl. ¶ 8). As instructed, Plaintiffs made and continued to make payments to Defendant, and Defendant accepted such payments. In May, 2008, Plaintiffs called Defendant to discuss Plaintiffs' financial difficulties arising from serious health problems. (Compl. ¶¶ 9, 10, 11). In August, 2008, Defendant contacted Plaintiffs and notified them that they qualified for an adjusted payment. Plaintiffs continued to make the adjusted payment when due through February, 2009. (Compl. ¶ 13).

On March 12, 2009, Plaintiffs received a worksheet from Defendant. As instructed by Defendant, Plaintiffs filled out and faxed the worksheet back to Defendant. (Compl. ¶ 14). Having not heard back from Defendants, on April 2, 2009, Plaintiffs faxed Defendant to ask when they should expect a response to their application. Plaintiffs received no response and faxed again on April 13, 2009, and again on May 1, 2009. (Compl. ¶ 15). Finally, Plaintiffs spoke to a representative of Defendant who told them Defendant was "in a state of flux." (Compl. ¶ 15). Plaintiffs continued to hear nothing, so they called Defendant again on May 12, 2009. (Compl. ¶ 16). At that time representative "Al" thanked Plaintiffs for calling and said that there was a huge backlog and that eventually a loan counselor would be assigned to their case to help. (Comp. ¶ 16).

On June 6, 2009, Plaintiffs sent a letter to Defendant requesting a direct number for "Wayne," so they could contact him. Having gotten no reply, on June 9, 2009,

plaintiffs tried three times to get through by phone and also sent a fax. (Compl. ¶ 19). In a fourth call, Plaintiffs got no answer and no voicemail. When they finally reached a representative, Plaintiffs were transferred and then disconnected. (Compl. ¶ 19).

On June 11, 2009, Plaintiffs called Defendant and were assured by "Diann" that they were not in danger of foreclosure. (Compl. ¶ 20). On June 18, 2009, Plaintiffs were told by "Kathy" that they must pay $1,332.00 in July and August to hold off foreclosure, which Plaintiffs did. (Compl. ¶ ¶ 21, 22). After making their July 1, 2009 payment, "Mark", a representative of Defendant told Plaintiffs that he was submitting an application for Plaintiffs to have their payment reduced to around $600.00 per month and to lengthen the term of the mortgage. (Compl. ¶ 22).

Plaintiffs continued to have conversations with Defendant's representatives, to correspond with Defendant, and to receive various reassurances and representations from Defendant. (Compl. ¶ 24). On September 29, 2009, Plaintiffs were again assured by Defendant that Plaintiffs were not in danger of foreclosure.

On December 15, 2009, Plaintiffs were told by "Diann," a representative of Defendant, that they were good prospects for the loan modification program and should hear in 30 to 60 days. On February 4, 2010, Plaintiffs again spoke with "Diann" and were finally told they had qualified for a lower payment of $1,250.74 per month through a loan modification agreement. (Compl. ¶ 27). Defendant told Plaintiffs that their new interest rate was 2% and that the interest rate would gradually increase to 5% after five years. (Compl. ¶ 27). Defendant told Plaintiffs that their first payment of $1,250.74 was due on March 1, 2010. Defendant also assured Plaintiffs that the paperwork for their new

agreement would arrive via UPS and that the plaintiffs should sign and return it to Defendant. (Compl. ¶ 27). Plaintiffs made the adjusted payment of $1,250.74 on the first of every month from March to November, 2010. Defendant unconditionally accepted each and every payment. (Compl. ¶ 28).

However, Plaintiffs did not receive their new loan documents as promised. (Compl. ¶ 29). Plaintiffs continued to contact Defendant and were continually reassured the papers would come. (Compl. ¶ 29). On August 2, 2010, Plaintiffs were told to just keep making payments and the papers would come. (Compl. ¶ 29). On September 2, 2010, Plaintiffs were told the papers would be coming in a week. (Compl. ¶ 29).

No documents have ever been received by Plaintiffs. (Compl. ¶ 29).

On November 15, 2010, Defendant, through its attorney, wrote Plaintiffs notifying them that Plaintiffs' account had been forwarded to an attorney for foreclosure purposes. (Compl. ¶ 30). When Plaintiffs made their December 1, 2010 payment, instead of accepting it as it had always done, Defendant refused payment. (Compl. ¶ 31). Accordingly, Plaintiffs have paid the December 2010 payment and all subsequent payments into escrow. (Compl. ¶ 31).

On December 21, 2010, Defendant's attorney notified Plaintiffs' attorney that Defendant was waiting to receive an assignment from Harmonic Mortgage before proceeding any further. (Compl. ¶ 32). Defendant's attorney said he would call when he received the assignment. Plaintiffs have received no further word about the assignment.

## LEGAL ANALYSIS

### I. Standard of Review for Motion to Dismiss

In reviewing a complaint under a Rule 12(b)(6) motion to dismiss, the Court considers all the facts alleged in the complaint as true, and construes the pleadings in a light most favorable to the claimant, the non-moving party. *Bhd. of Maint. of Way Employees v. Burlington N. Santa Fe. R.R.*, 270 F.3d 637, 638 (8th Cir. 2001). It is not enough to merely provide labels and conclusions, and recite the elements of a cause of action. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1965. The Plaintiffs have alleged a claim that is "plausible on its face," *Id.* at 1974, and therefore the Motion to Dismiss on each claim should be denied.

## II. Defendant has made no credible claim that it owns the mortgage. Therefore, Defendant has been unjustly enriched by receiving and retaining a series of payments from Plaintiffs.

To recover for unjust enrichment, the receiver must plead that the creditor "knowingly received something of value, not being entitled to the benefit, and under circumstances that would make it unjust to permit its retention." *Southtown Plumbing, Inc. v. Har-Ned Lumber Co., Inc.*, 493 N.W. 2d 137, 140 (Minn.Ct.App.1992). Minnesota law supports a finding of unjust enrichment even without proof of an illegal or fraudulent activity. "Appellant argues that because its actions were not unlawful, the doctrine of unjust enrichment cannot be invoked against it. We cannot agree." *TCF Banking & Sav., F.A. v. Loft Homes, Inc.*, 439 N.W.2d 735, 738 (Minn.App. 1989) *(review denied)*.

In *S.E.C. v. Brown*, 643 F.Supp.2d 1077 (2009 D.Minn.) the Federal Court considered whether to impose a requirement of illegal or fraudulent activity in an unjust enrichment

case. In *Brown,* the Court held no illegal activity was necessary to sustain an unjust enrichment claim. *Id.* at 1083-84. There, the Court said,

> "In *Buckhalton,* the Minnesota Court of Appeals stated: . . . 'we conclude that despite the absence of proof of fraud or illegal conduct on the part of appellants, because of equity, they are not entitled to the money. The money came to them as a direct result of the fraudulent nature by which it was obtained and transferred.' [*Techsystems Federal Credit Union v. Buckhalton,* No. C2-99-1194, 2000 WL 53875 at *3 (Minn.Ct.App. Jan. 25, 2000).] A court in this district [*Koenig]* found the *Buckhalton* and *Wells Electric* courts' reasoning persuasive, holding: 'Although the Amended Complaint does not allege that the defendant participated in the fraudulent scheme, it alleges that he received the proceeds from a sale based on fraud. These allegations sufficiently set forth a circumstance where it would be inequitable for the defendant to retain the proceeds.' [*Kranz v.]Koenig*, 484 F.Supp.2d [997,]1001[D. Minn.2007]. CitiMortgage attempts to distinguish *Buckhalton* and *Koenig* on the basis that those cases dealt with transactions in which no consideration was paid for the transfer of assets whereas here, the payments to CitiMortgage were made on a valid mortgage obligation. The Court is unpersuaded by this or other distinctions proposed by CitiMortgage." *S.E.C. v. Brown,* at 1084.

Failure of consideration, fraud, mistake, and other situations where it would be morally wrong for one party to enrich himself at the expense of another, all provide a basis for an unjust enrichment claim. *Cady v. Bush,* 283 Minn. 105. 166, N.W. 2d 358, 361-62. Here, where Plaintiffs' claims must be accepted as true, it would be inequitable for Defendant to retain the payments made by Plaintiffs. The Defendant has provided no proof that it is the owner of the Plaintiffs' mortgage. (Compl. ¶ 32). Yet, Defendant has received and accepted payments from Plaintiffs. (Compl. ¶ 28). Defendants have been unjustly enriched by retaining a benefit to which they are not entitled.

Defendant alleges in its memorandum that Plaintiffs would be unjustly enriched if Defendant was to return all payments. (Def.'s Mem. Supp. Mot. to Dismiss 8). This is

not true. Plaintiffs are required to pay the mortgage payments to the valid holder of their mortgage, which at this point, is not Defendant. Upon payment to the appropriate creditor, Plaintiffs will not be unjustly enriched.

## III. Where the misrepresentations and misleading statements of Defendant were the only actions that prevented a writing from being created, the Statute of Frauds should not preclude consumer protection under the Consumer Fraud Act.

The Consumer Fraud Act, Minn. Stat. § 325F.69, was designed to prohibit deceptive practices and to address the unequal bargaining power often present in consumer transactions. *Ly v. Nystrom,* 615 N.W. 2d 302, 308 (citing Jeff Sovern, Private Actions Under the Deceptive Trade Practices Acts: Reconsidering the FTC Act as Role Model, 52 Ohio St. L. J. 437,446 (1991)). The Supreme Court of Minnesota stated, "the legislative history clearly indicates that the CFA [Consumer Fraud Act] was intended to protect a broad, though not limitless, range of individuals from fraudulent and deceptive trade practices, and our decisions have also recognized the breadth of its coverage."*Ly v. Nystrom*, 615 N.W. 2d 302.

A complimentary statute, the Private Attorney General Statute, (Minn. Stat. § 8.31, subd. 3a), further protects the consumer by allowing private attorneys to pursue claims for consumers. This bill was enacted in light of the limited ability of the Attorney General to prosecute all claims of consumer fraud. The sponsor of the Private Attorney General Statute stated, "it's simply impossible for the Attorney General's Office to investigate and prosecute every act of consumer fraud in this state." *Ly v. Nystrom,* at 311

(citing Hearing on S.F. 819 Comm. Labor and Commerce, 68th Minn. Leg., Mar. 8, 1973 (audio tape) (comments of Sen. Borden, Senate sponsor of bill)).

The existence of these statutes "reflect[s] a clear legislative policy encouraging aggressive prosecution of statutory violations" and thus should be "generally very broadly construed to enhance consumer protection." *State v. Phillip Moris, Inc.*, 551 N.W. 2d 490, 495-96 (Minn. 1996). To enhance consumer protection under the Consumer Fraud Act, the Supreme Court of Minnesota, through its rulings, has made recovery available to a broad spectrum of consumers. Included in this spectrum are one-on-one transactions. *Church of Nativity of Our Lord v. WatPro Inc.*, 491 N.W. 2d 1, 8. (Individual church could seek remedy against a contractor for a single transaction); *Ly v. Nystrom*, 615 N.W. 2d 302. (A restaurant buyer's one-on-one transaction was protected by the Consumer Fraud Act.)

The transaction between the Plaintiffs and Defendant clearly falls under the protection of the Consumer Fraud Act. Plaintiffs are individual consumers and are not sophisticated parties or merchants. (Sophisticated parties and merchants have special bargaining power and their transactions are covered by the Uniform Commercial Code, instead of the Consumer Fraud Act.) *Church of Nativity*, at 8.

Minnesota's consumer protection statutes were enacted to protect Minnesota consumers from unlawful and fraudulent business practices and have been broadly construed to protect the consuming public at large. *Ly v. Nystrom*, at 310 (citing Gary L. Wilson & Jason A. Gillmer, *Minnesota's Tobacco Case: Recovering Damages Without*

*Individual Proof of Reliance Under Minnesota's Consumer Protection Statutes*, 25 Wm. Mitchell L. Rev. 567, 576 (1999)).

Defendant claims it need not honor the parties' loan modification agreement because they argue that Minn. Stat. § 513.33 necessitates that this transaction be in writing, and there is no writing in this case. Plaintiffs agree that there is no writing, but this is only because Defendant fraudulently represented that the papers were on their way to Plaintiffs via UPS.

Plaintiffs could not have made a more persistent effort to secure the writing memorializing their agreement. Plaintiffs attempted to communicate with Defendant about changes to their mortgage on March, 3, April 2, April 13, May 12, May 27, May 30, June 6, four times on June 9, and June 11, June 18, July 1, July 21, September, 29, and December 15, of 2009. (Compl. ¶¶ 14-26). In addition, Plaintiffs continued to pursue a writing with Defendant by contacting Defendant February 4, August 2, and September 2, of 2010. (Compl. ¶ 27-29). Plaintiffs filled out worksheet paperwork and complied with all requests from Defendant. (Compl. ¶ ¶ 14, 33) Defendant consistently assured Plaintiffs that a writing would come. (Compl. ¶ 29). Defendant never returned paperwork to Plaintiffs, though it continually accepted payments under the modified agreement from March 1, 2010 to November 1, 2010. (Compl. ¶ 28). At no time did Defendant communicate to Plaintiffs that the modified loan agreement, whose terms Plaintiffs were performing, was invalid.

Defendant seeks to avoid application of the Consumer Fraud Statute by arguing that this cause of action is an "action on a credit agreement." (Def.'s Mem. Supp. Mot. to

Dismiss 4). It is not. It is just the opposite. Defendant's acts which support the fraud claim are its continued promise to the effect that "the papers are in the mail, so just keep sending us more money," and its continued deception that Defendant was the owner of Plaintiffs' mortgage and note. (Compl. ¶ 29).

Under this count, plaintiffs are *not* seeking to enforce a credit agreement. Instead, they are merely seeking their statutory remedies for having been the victims of fraud.

**IV. Where Plaintiffs have made each and every agreed-upon payment and are current to date on their payments, and where Plaintiffs have diligently pursued documentation of the agreement, a claim of promissory estoppel lies.**

"Promissory estoppel is an equitable doctrine that implies a contract in law where none exists in fact." *Martens v. Minnesota Mining & Mfg. Co.*, 616 N.W.2d 732, 746 (Minn. 2000). "Promissory estoppel has three elements: (1) a clear and definite promise; (2) the promisor intended to induce reliance and such reliance occurred; and (3) the promise must be enforced to prevent injustice." *Greuling v. Wells Fargo Home Mortgage, Inc.*, 690 N.W. 2d 757, 761 (Minn. App. 2005) (citing *Olson v. Synergistic Techs. Bus. Sys., Inc.*, 628 N.W. 2d 142, 152 ( Minn.2001)). Plaintiffs have shown that all three of these elements have been met.

**A. First, Plaintiffs have offered evidence to show that there was a clear and definite promise from Defendant to modify Plaintiffs' mortgage.**

As detailed in the complaint, Plaintiffs were told by Defendant on February 4, 2010, that they "qualified for a lower payment of $1,250.74 per month." (Compl. ¶ 27). The details of the promise to modify were further explained by Defendant on that date,

stating, "[the] new interest rate was 2% and that the interest rate would gradually increase to 5% after 5 years. . . [and the] first payment *under the new loan* would be $1,250.74 due on March 1, 2010." *Id.* (emphasis added). In communicating with Plaintiffs, Defendant was clear that the terms discussed were different than the terms of the previous agreement, therefore admitting that a new loan agreement was in place. The Plaintiffs were given specific details about their new agreement; the date of the agreement, the new agreed upon payment, the interest rate, a pre-planned change to the interest rate, and the due date of the payment.

These details known to Plaintiffs differ dramatically from the recollection of a loan modification agreement that was found inadequate by the *Myrlie* court. The plaintiff in *Myrlie v. Countrywide Bank*, __ F. Supp. 2d__, 2011 WL 742730, (D. Minn. Feb. 23, 2011) failed to raise a genuine issue of material fact in respect to the third element of promissory estoppel. In *Myrlie*, the Plaintiff only recollected vague terms of the modification agreement and *could not recall any of the alleged agreed-upon conditions*. This is absolutely not the case with the Wentzel plaintiffs, where there are precise and specific agreed-upon terms of the loan modification agreement.

**B. Second, Plaintiff has shown that Defendant intended to induce reliance on the agreement. Plaintiff has relied on this inducement to Plaintiffs' detriment.**

The second element of promissory estoppel requires proof that the defendant intended to induce reliance and proof that the plaintiffs relied on the defendant's inducement to the plaintiffs' detriment. *Myrlie* at *5, (citing *Ruud v. Great Plains Supply, Inc.*, 526 N.W. 2d 369. 372 (Minn.1995)). Defendant intended to induce

Plaintiffs' reliance on the loan modification agreement. This is evidenced by Defendant's consistent and repeated communication with Plaintiffs that assured Plaintiffs that the modification documents were on their way or were being processed. (Compl. ¶ 29). After the February 4, 2010 conversation where the explicit details of the new mortgage loan agreement were agreed to, Defendant began unconditionally accepting payments pursuant to the new agreement. (Compl. ¶ 28). At no time before Plaintiffs were notified that their account had been forwarded to an attorney for foreclosure purposes, after nine months of payments, did Defendant give any hint that it would try to back out of the agreement.

Once again, the actions of the Wentzels, and therefore the equities, differ greatly from the actions (or non-actions) of the Plaintiff in *Myrlie.* In *Myrlie,* the plaintiff was "not surprised" that the defendant was foreclosing on his mortgage, because the plaintiff did not make any payments under the modified terms. *Myrlie* at *5. This is not the case with the Wentzels. They were shocked when they received notice out of the blue that their account had been forwarded for foreclosure purposes. Defendant told Plaintiffs they had an agreement with Defendant, and both parties had been performing agreement without fail, paying and accepting, respectively, each payment on time in the amount agreed upon. (Compl. ¶ 28).

Plaintiffs have suffered detriment by the retention of their mortgage payments by a company that has no claim to their mortgage or the relevant payments. They have been deprived use of those sums to pay the appropriate holder of their mortgage. Plaintiffs

have invested significant time and effort in an attempt to reach an agreement with Defendant about these payments, but Defendant has been uncooperative.

### C. Third, the Court must find that justice requires enforcement of the agreement.

This is the third and final element of promissory estoppel. "The court considers the injustice factor as a matter of law, looking to the reasonableness of the promisee's reliance and weighing public policies (in favor of both enforcing bargains and preventing unjust enrichment.)" *Greuling* at 761 (citing *Faimon v. Winona State Univ.,* 540 N.W. 2d 879, 883 (Minn.App. 1995)).

The Plaintiffs' actions in this case were well beyond reasonable. The Plaintiffs were continually assured by agents of Defendant that they should continue to act in the same way, that the documents would be mailed, and that they should continue to make payments in the same manner. (Compl. ¶ 29). With these assurances, Plaintiffs were reasonable in believing that the papers were being processed, that they would actually be sent, and that if they continued to make payments, they would not experience any harm. This sentiment was reiterated to Plaintiffs continually throughout communication with Defendant and its agents. (Compl. ¶¶ 20, 22, 25,26, 29). There is no reason the plaintiffs would have continued to send money month after month if they had been told it was money down the drain and they would be foreclosed on anyway.

In contrast, the court found in *Myrlie* that it was not unjust to not enforce the alleged loan modification agreement. There, the Plaintiff had demonstrated no ability to meet the obligations of *any* loan agreement. *Myrlie* at *5 (emphasis added.) The court

opined that if the *Myrlie* plaintiff had any ability to obtain financing or make payments he would have done so during the foreclosure redemption period, which he had failed to do. This is not the situation in the present case. The Wentzel Plaintiffs demonstrated that they were able to make payments under the loan modification agreement and they did so promptly. They continue to make those payments to this day, even though Defendant now refuses to accept them. (Compl. ¶¶ 28, 31) Plaintiffs have been responsible in their payments and their actions toward the Defendant. They have demonstrated the utmost good faith. Defendant has kept none of its promises.

As a matter of public policy, debtors that make on-time payments according to an agreement that is based on a clear and definite promise that the creditor leads the debtor to rely on, should be enforced by the court. The Plaintiffs went to extreme measures to get a written agreement signed. They communicated with Defendant over 27 times, complied with each and every request of Defendant, and still Defendant chose to ignore the agreement they had reached. (Compl. ¶ 24). Inexplicably, while on the one hand telling Plaintiffs everything was on track, Defendant was, on the other hand, forwarding Plaintiffs' account to an attorney for foreclosure. To avoid injustice, Defendant must be estopped from ignoring its agreement and held accountable for its retention of payments to which it can prove no claim of right.

Defendant argues, correctly, that "CitiMortgage is not required to enter into a modification agreement with Plaintiffs." That statement is not relevant, because here, taking the complaint to be true, CitiMortage already *did* enter into a modification agreement. The only issue is whether the agreement is enforceable.

## V. Plaintiffs' claims are not barred by the Minnesota Credit Agreement Act, Minn.Stat. § 513.33.

### A. The act does not bar a claim of unjust enrichment.

The elements of plaintiffs' claim of unjust enrichment, discussed above, do not depend on the credit agreement or the existence thereof. Under the facts set forth in the complaint, taken as true, plaintiffs have paid money to one who has no legitimate claim to it, and they are entitled to get it back.

### B. The act does not bar a claim of promissory estoppel.

In *Myrlie*, *supra*, the plaintiff had no promissory estoppel claim, because plaintiff's facts fell far short of those required to support such a claim. The Court granted summary judgment of the ground that "Plaintiff has failed to raise a genuine issue of material fact to support his claim of promissory estoppel."

Having already disposed of the claim, the Court went on to analyze whether the credit statute constituted a separate defense. The Court properly noted that the Minnesota Court of Appeals has held that it does, in *Grueling v. Wells Fargo*, 690 N.W.2d 757, 761 (Minn.App. 2005). The Minnesota Supreme Court, however, has never ruled on the issue.

In *Myrlie*, the Court discussed the fact that the plaintiff there offered no evidence of the terms of the supposed modification. The Court noted further that the defendants had presented evidence that there was never a loan modification agreement. In the present case, at least for Rule 12 purposes, it must be taken as true that there was in fact a loan modification agreement, that there was mutual agreement, and that the terms were

those set forth by the plaintiffs. Under these circumstances, it may very well be that the Court finds that the statute is not an absolute bar. Since promissory estoppel is an equitable doctrine, and since it assumes the absence of a contract *(Martens, supra)*, this Court may very well conclude that the different equities lead to a different conclusion.

**C. The act does not bar a claim under the Minnesota Consumer Fraud Act.**

Defendant seeks to avoid application of the Consumer Fraud Statute by arguing that this cause of action is an "action on a credit agreement." (Def.'s Mem. Supp. Mot. to Dismiss 4). It is not. It is just the opposite. Defendant's acts which support the fraud claim are its continued promise to the effect that "the papers are in the mail, so just keep sending us more money," and its continued deception that Defendant was the owner of Plaintiffs' mortgage and note. (Compl. ¶ 29).

Under this count, plaintiffs are *not* seeking to enforce a credit agreement, nor are they making a claim upon the credit agreement. Instead, they are merely seeking their statutory remedies for having been the victims of fraud.

In *Grueling, supra*, cited by defendants, the Minnesota Court of Appeals dismissed plaintiff's negligent misrepresentation claim, but not on the grounds that it was barred by the statute. It was dismissed instead because the "evidence conclusively shows that Grueling's damages were not caused by Malo's misrepresentation…" 690 N.W.2d at 760.

## CONCLUSION

These diligent plaintiffs successfully negotiated a modified loan agreement with Defendant on February 4, 2010. Only through the Defendant's actions was this agreement not reduced to writing. After nine months of honoring the agreement and accepting payments from Plaintiffs, Defendant suddenly chose to break its promise, and refuse to accept payments any longer. Justice requires that the Defendant either return the mortgage payments or prove that it has a claim of right to the payments through the production of a mortgage assignment document

Respectfully submitted,

PEMBERTON, SORLIE, RUFER
& KERSHNER, P.L.L.P.

Dated: June 29, 2011

By: s/Stephen F. Rufer
Stephen F. Rufer, No. 94286
110 North Mill Street, P.O. Box 866
Fergus Falls, Minnesota 56538
Telephone: 218-736-5493
Facsimile: 218-736-3950
Email: s.rufer@pemlaw.com

**ATTORNEYS FOR PLAINTIFFS**

SFR:mo
2010-7655